# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-4251

_____

Lorraine Lacroix,                      *
                                       *
          Appellant,                   *
                                       *   Appeal from the United States
     v.                                *   District Court for the
                                       *   Southern District of Iowa.
Jo Anne B. Barnhart, Commissioner      *
of Social Security,                    *
                                       *
          Appellee.                    *

_____

Submitted: May 17, 2006
   Filed:  October 20, 2006

_____

Before WOLLMAN, BRIGHT, and BOWMAN, Circuit Judges.

_____

BOWMAN, Circuit Judge.

Lorraine Lacroix appeals the District Court's[1] affirmance of the Social Security Commissioner's decision denying her applications for disability insurance benefits (SSDI) and supplemental security income (SSI) under the Social Security Act. We affirm.

_____

[1]The Honorable Charles R. Wolle, United States District Judge for the Southern District of Iowa.

## I.

Lacroix is a fifty-one-year-old woman with a GED and past work experience as a construction worker and cashier. She claims that, beginning on July 22, 2001, she became disabled and unable to work as a result of combined physical impairments (hearing loss, hand problems, and painful bumps on her arms and legs) and mental impairments (impulse control disorder, anxiety, and depression).

Lacroix was examined by three physicians in connection with her physical ailments. First, on September 5, 2002, Michael Tomek, M.D., evaluated her hearing loss. Dr. Tomek diagnosed Lacroix with bilateral hearing loss that was progressive in nature. Lacroix's discrimination was "very poor, being 44% in the right ear and 60% in the left ear." Admin. R. at 132. Dr. Tomek noted that it was very difficult to understand Lacroix's speech because she was unable to hear all of the consonants and vowels in spoken words. Dr. Tomek recommended a hearing-aid trial, but noted that hearing aids might not be effective given the extent of Lacroix's hearing loss. Finally, Dr. Tomek noted that Lacroix was a candidate for cochlear implants.

The next day, Lacroix was examined by James Putnam, M.D. Dr. Putnam opined that Lacroix had a full range of motion and was able to carry ten pounds on a frequent basis and twenty-five pounds on a rare basis. He noted that she had no limits to standing, walking, or sitting in an eight-hour day. While Dr. Putnam concluded that Lacroix had a moderate degree of hearing difficulty, he noted that she could adequately hear a slightly-above-normal tone of voice.

Jennifer Jones, M.D., examined Lacroix in January 2003. A hearing test revealed that Lacroix had "moderate to severe/profound sensorineural hearing loss," for which Dr. Jones recommended hearing aids. Id. at 179. Dr. Jones also diagnosed Lacroix with depression and prescribed medication for its treatment.

With regard to her mental impairments, Lacroix was examined by Dr. Juan Aquino, a licensed psychologist, in September 2002 and May 2004. After the 2002 visit, Dr. Aquino concluded that Lacroix suffered from adjustment disorder with depression and anxiety, trichotillomania (hair pulling), and personality disorder. Lacroix's Global Assessment of Functioning (GAF) score was 64, which is indicative of "mild symptoms" or "some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders Fourth Edition Text Revision 34 (2000) (DSM-IV-TR). Dr. Aquino opined that Lacroix's attention and concentration were adequate, that she should be able to remember and understand simple instructions and procedures, and that her "[j]udgment, reliability, and ability to interact with others may be compromised by any return to regular use of cocaine [which is in remission,] and by underlying characterological difficulties." Admin. R. at 143.

During the May 2004 visit, Dr. Aquino administered two psychological tests: the Wechsler Adult Intelligence Scale–Third Edition (WAIS–III) and the Minnesota Multiphasic Personality Inventory–2 (MMPI–2). On the WAIS–III, Lacroix achieved a full scale intelligence quotient (IQ) score of 80, which placed her in the low-average range of intellectual functioning. On the MMPI–2, Lacroix endorsed a wide variety of rare symptoms and attitudes that suggested an invalid profile consistent with exaggeration and a strong tendency to over-endorse psychological problems. Dr. Aquino diagnosed Lacroix as having personality disorder and major depressive disorder with anxiety. Lacroix's GAF score was then 55, which is indicative of "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning." DSM-IV-TR 34. Dr. Aquino concluded that Lacroix had no more than minimal limitations in understanding, remembering, and carrying out short and simple instructions and in making judgments on simple work-related decisions. Lacroix had mild limitations—but could generally function well—in understanding, remembering, and carrying out detailed instructions; in interacting with the public, supervisors and

coworkers; and in responding appropriately to changes in routine work settings. Finally, Dr. Aquino noted moderate limitations in Lacroix's ability to respond appropriately to work pressures in a usual work setting, but opined that she would be able to function satisfactorily in this area.

Lacroix received treatment for her mental disorders at the Gannon Center for Community Mental Health. Lacroix began going to the Gannon Center in March 2003, and a team of professionals was appointed to her care. Lacroix met regularly with Pat Everly, a licensed social worker, who provided psychotherapy; Tina Budreau, a nurse practitioner, who proscribed and monitored Lacroix's psychiatric medications; and Terri Spencer, who provided community support services. During Lacroix's first visit, Everly diagnosed Lacroix with posttraumatic stress disorder and major depression. Lacroix's GAF score was 55.

In a March 4, 2004, letter, Budreau and Everly opined that Lacroix's symptoms of posttraumatic stress disorder would likely make it difficult for her to maintain focus, concentration, and adequate pace in a job; that Lacroix's fears of being attacked would cause her trouble interacting appropriately with co-workers, supervisors, and the public; and that Lacroix's safety concerns and high anxiety would make it unlikely that she would be able to adapt in the workforce. Budreau and Everly noted, however, that Lacroix "has the intellectual ability to understand, remember, and follow instructions." Admin. R. at 193.

In a June 2004 mental assessment, Budreau noted that Lacroix would be unable to maintain attention for two-hour periods, sustain an ordinary routine without special supervision, work in close coordination with or proximity to others without being unduly distracted, complete a normal workday and workweek without interruptions from psychologically based symptoms, accept instructions and respond appropriately to criticism from supervisors, deal with work stress, use public transportation, travel in unfamiliar places, carry out detailed instructions, set realistic goals, or deal with

-4-

the stress of semi-skilled or skilled work. On the other hand, Budreau noted that Lacroix would be able to perform many other functions in a satisfactory manner, including understanding, remembering, and carrying out simple instructions, maintaining regular attendance and being punctual, responding appropriately to changes in routine work settings, getting along with coworkers and peers without unduly distracting them or exhibiting behavioral extremes, and maintaining socially appropriate behavior.

The Commissioner denied Lacroix's applications for SSI and SSDI, initially and upon reconsideration. A hearing was then held before an administrative law judge (ALJ) on July 14, 2004. In considering Lacroix's claims, the ALJ followed the familiar five-step analysis mandated by 20 C.F.R. §§ 404.1520, 416.920. The ALJ determined that Lacroix's "sensorineural hearing loss, skin lesions, major depressive disorder with anxiety, posttraumatic stress disorder, trichotillomania, and personality disorder are considered 'severe.'" Admin. R. at 27. The ALJ concluded, however, that these impairments did not meet or medically equal any of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ then found that Lacroix retained the residual functional capacity ("RFC") to perform unskilled light work with the following conditions: (1) "lift and carry 25 pounds occasionally and 10 pounds frequently with pushing and pulling commensurate to her lifting and carrying ability," (2) "sit, stand, and walk without restrictions," (3) "hearing limitations to the extent that [she] can understand conversations but should not have a job that requires excellent hearing, e.g. not a 911 operator, receptionist or waitress," and (4) "mental limitations that preclude jobs requiring her to deal with the general public." Admin. R. at 25–26. The ALJ included these limitations in hypothetical questions, which he posed to a vocational expert (VE). The VE testified that a person with Lacroix's characteristics and limitations, while not able to perform the requirements of Lacroix's past relevant work, could perform jobs that exist in the national economy, including "addressor," "folder working in a laundry," and "page, someone working in the library replacing materials back on to the shelving." Id. at

286. Because the ability to perform jobs in the national economy precludes a claimant from being deemed disabled, 20 C.F.R. §§ 404.1520(g), 416.920(g), the ALJ determined that Lacroix was not entitled to SSDI benefits or SSI payments.

The administrative appeals council denied review of the ALJ's decision, resulting in a final decision of the Commissioner. Lacroix appealed to the District Court under 42 U.S.C. § 405(g), and the District Court affirmed the Commissioner's decision. Lacroix now appeals the District Court's decision.

## II.

We review de novo the District Court's affirmance of the Commissioner's denial of SSDI and SSI benefits. Tindell v. Barnhart, 444 F.3d 1002, 1004 (8th Cir. 2006). In so doing, we must consider whether the ALJ's decision is free of legal error and whether the ALJ's findings of fact are supported by substantial evidence when viewing the record as a whole. Brown v. Barnhart, 390 F.3d 535, 538 (8th Cir. 2004). Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion. Shontos v. Barnhart, 328 F.3d 418, 423 (8th Cir. 2003). We must consider evidence that detracts from the ALJ's decision, as well as evidence that supports the ALJ's decision, "but we may not reverse merely because substantial evidence exists for the opposite decision." Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996).

## III.

Lacroix contends that the ALJ committed three errors that require reversal of the Commissioner's denial of benefits. We address each argument in turn.

A.

First, Lacroix argues that the ALJ committed legal error in reaching his decision by giving—according to Lacroix—"no weight" to the opinions of the therapists and nurse practitioner who comprised Lacroix's treatment team at the Gannon Center. Appellant's Br. at 20. Lacroix asserts that the ALJ erroneously gave greater weight to the opinions of Dr. Aquino, who examined her only twice and did not treat her, than to the opinions of her treating sources at the Gannon Center. The Social Security Regulations provide a detailed explanation of how the Commissioner evaluates and weighs medical opinion evidence. See 20 C.F.R. §§ 404.1527(d), 416.927(d). The medical opinions of "treating sources" on the nature and severity of a claimant's impairments are given "more weight" than non-treating sources and are even given "controlling weight" if certain conditions are met. Id. §§ 404.1527(d), 416.927(d). Nevertheless, Lacroix's argument fails.

A "treating source" is defined as a "physician, psychologist, or other acceptable medical source" who treats the claimant. Id. §§ 404.1502, 416.902; see also Social Security Ruling 06-03p, 71 Fed. Reg. 45,593, 45,594 (Aug. 9, 2006) ("[O]nly 'acceptable medical sources' can be considered treating sources, as defined in 20 C.F.R. 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight."). Similarly, "medical opinions" are defined as "statements from physicians and psychologists or other acceptable medical sources." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2); see also Social Security Ruling 06-03p, 71 Fed. Reg. at 45,594 ("[O]nly 'acceptable medical sources' can give us medical opinions."). As Lacroix concedes, the nurse practitioner and therapists at the Gannon Center are not physicians, psychologists, or other acceptable medical sources as defined by the Regulations. See 20 C.F.R. §§ 404.1513(a), 416.913(a) (excluding therapists and nurse practitioners from the list of acceptable medical sources); Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005) ("A therapist is not an 'acceptable medical source' to establish 'a medically determinable impairment.'"). Thus, Budreau, Everly

and Spencer were not treating sources and their opinions were not entitled to greater weight. See Tindell, 444 F.3d at 1005 (ruling that a licensed therapist is not a treating source as defined by the regulations).

Lacroix relies heavily on Shontos v. Barnhart, 328 F.3d 418 (8th Cir. 2003), for the proposition that the opinions of her providers at the Gannon Center should be given treating-source weight. In Shontos, we ruled that a nurse practitioner and a counselor at the Gannon Center were not acceptable medical sources, but nonetheless considered them treating sources whose opinions were entitled to greater weight than those of non-treating consultants. Id. at 426–27. This case is distinguishable from Shontos, however, in one critical aspect: the treatment team in Shontos included a psychologist whose participation in the claimant's care gave the entire treatment team treating-source status. Id.; see also Tindell, 444 F.3d at 1005 (distinguishing Shontos and holding that the opinions of a therapist who was not "associated with a physician, psychologist, or other acceptable medical source that could potentially give him treating source status" were not entitled to greater weight). Indeed, the record in Shontos contained a "§ 245.7 Form: Medical Opinion Re: Ability to Do Work-Related Activities (Mental)" completed by the psychologist and evaluated by the ALJ. Shontos, 328 F.3d at 421. In contrast, the record in this case does not contain a report by an acceptable medical source at the Gannon Center, nor do any of the reports by Budreau, Everly, or Spencer refer to a doctor's participation in Lacroix's care. While Lacroix argues that the ALJ should have further developed the record to determine whether an acceptable medical source participated in her care at the Gannon Center, she has presented no evidence suggesting that such an inquiry would have yielded an affirmative answer. Accordingly, Lacroix has failed to establish the prejudice necessary for a reversal due to failure to develop the record. See Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993).[2]

_____

[2]We further note that Lacroix was represented by counsel in the proceedings before the ALJ. See Onstad, 999 F.2d at 1234 (noting that, when represented by a

-8-

While the opinions of Budreau, Everly and Spencer were not entitled to treating-source weight, they were entitled to consideration. The Regulations state that "[i]n addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we may use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work." 20 C.F.R. §§ 404.1513(d), 416.913(d). Therapists and nurse practitioners are specifically listed as "other" medical sources who may present evidence of the severity of the claimant's impairment and the effect of the impairment on the claimant's ability to work. Id. §§ 404.1513(d)(1), 416.913(d)(1). The ALJ correctly viewed the opinions of the Gannon treatment team as other-source evidence and gave them "much consideration." Admin. R. at 18. The ALJ's decision discusses in careful detail the opinions of Budreau, Everly and Spencer. The ALJ ultimately determined, however, that the opinions were not supported by objective psychological tests, were inherently inconsistent, and were inconsistent with other evidence in the record. See Raney, 396 F.3d at 1010 ("In determining what weight to give 'other medical evidence,' the ALJ has more discretion and is permitted to consider any inconsistencies found within the record."); Cf. Social Security Ruling 06-03p, 71 Fed. Reg. at 45,596 (stating that more weight may be given to the opinion of a medical source who is not an acceptable medical source if "he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion."). The ALJ therefore accorded more weight to the opinions of Dr. Aquino, who, while not a treating physician, was an examining physician. The ALJ found Dr. Aquino's opinions "more consistent with the claimant's prior reports concerning her day to day functioning and well supported by the objective evidence of record." Admin. R. at 22. After thoroughly reviewing the record, we find no error in this decision.

---

lawyer, whether the lawyer attempted to obtain the information "missing" from the record is relevant to the prejudice inquiry).

B.

Lacroix next argues that the ALJ's determination of her RFC was not supported by the medical evidence in the record. "The ALJ should determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004) (internal quotation and citation omitted). The ALJ described Lacroix's RFC as follows:

> can lift and carry 25 pounds occasionally and 10 pounds frequently with pushing and pulling commensurate to her lifting and carrying ability . . . can sit, stand and walk without restrictions but she does have hearing limitations to the extent that she can understand conversations but should not have a job that requires excellent hearing, i.e. not a 911 operator, receptionist or waitress . . . [and] has mental limitations that preclude jobs requiring her to deal with the general public.

Admin. R. at 21. The ALJ also noted that, since "unskilled jobs ordinarily involve dealing primarily with objects, rather than with data or people . . . [t]he claimant's mental limitations . . . do not significantly impact the unskilled occupational base." Id.

Lacroix contends that the ALJ's RFC finding should have included additional limitations based on her mental status and hearing loss. With respect to her mental limitations, Lacroix initially asserts that the opinions of the Gannon Center staff should have been used in developing the RFC. As discussed above, the ALJ did not find the opinions of the Gannon Center staff supported by the evidence or entitled to enhanced weight. The ALJ therefore had no obligation to include in the RFC the mentally based limitations contained in the Gannon Center reports. See Garza v. Barnhart, 397 F.3d 1087, 1088 (8th Cir. 2005) (upholding ALJ decision rejecting the

RFC findings of a treating social worker where those findings "conflicted with those of a consulting psychologist, whose findings were based on testing").

Lacroix also asserts that the ALJ did not include in the RFC some mentally based limitations contained in the reports of Dr. Aquino and the reviewing psychologist from the Iowa Disability Determination Services, Dr. Christiansen. Specifically, Lacroix makes much of the fact that in completing an evaluation form in May 2004, Dr. Aquino marked that Lacroix has "moderate" limitations in her ability to respond appropriately to work pressures in a usual work setting. Admin. R. at 204. Lacroix further notes that the Residual Functional Capacity Assessment completed by Dr. Christiansen stated that Lacroix was "moderately limited" in her abilities to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and respond appropriately to changes in work setting. Id. at 168–69.

We find that the ALJ's determination of Lacroix's RFC as it pertains to her mentally based limitations was supported by substantial evidence. As noted by the ALJ, "even though Dr. Aquino noted moderate limitations in the ability to respond appropriately to work pressures in a usual work setting, he still opined that the claimant would be able to function satisfactorily in this area." Id. at 18. Indeed, as noted on the evaluation form itself, a "moderate" ranking means that "the individual is still able to function satisfactorily." Id. at 203. Moreover, in the narrative portion of his first report, Dr. Aquino stated that Lacroix had "adequate" attention and concentration, and that she "should be able to remember and understand simple instructions, procedures, and locations." Id. at 143. Finally, the ALJ was not required to accept the findings of Dr. Christiansen to the extent, if any, they were inconsistent with Dr. Aquino's findings. Dr. Christiansen never examined (or treated) Lacroix, unlike Dr. Aquino who examined Lacroix on two occasions. The opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant. 20 C.F.R.

§§ 404.1527(d)(1), 416.927(d)(1); <u>Shontos</u>, 328 F.3d. at 425.  <u>See also</u> <u>Kelley v. Callahan</u>, 133 F.3d 583, 589 (8th Cir. 1998) ("The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.").[3]

With regard to her hearing loss, Lacroix argues that the ALJ's determination of her RFC did not adequately account for the severity of the loss and the accompanying limits on her abilities.  The ALJ found that Lacroix "can understand conversations but should not have a job that requires excellent hearing."  Admin R. at 21.  Lacroix asserts that the medical evidence supports an RFC finding that she has "moderate to profound hearing loss, with a commensurate loss in communicative ability due to an inability to discriminate consonants and vowels."  Appellant's Br. at 34.

While there is evidence in the record that Lacroix's hearing loss is more severe than described in the ALJ's RFC determination, there is also evidence in the record that supports the ALJ's determination.  As we noted above, "we may not reverse merely because substantial evidence exists for the opposite decision," so long as substantial evidence also supports the ALJ's decision when the record is viewed as a whole.  <u>Johnson</u>, 87 F.3d at 1017.  We conclude that the ALJ's determination of Lacroix's RFC pertaining to hearing loss is supported by substantial evidence.

---

[3]Lacroix also contends that the ALJ's opinion is internally inconsistent because in finding "severe" impairments at step two of the five-step analysis, the ALJ stated that Lacroix's mental impairments "significantly limit" her "abilities to understand, remember and carry out simple instructions, to respond appropriately to supervisors, coworkers, and unusual work situations, and to deal with changes in routine work settings," Admin. R. at 16, while these limitations were not included in the ALJ's RFC analysis at step four.  We reject this contention.  Each step in the disability determination entails a separate analysis and legal standard.  <u>See</u> 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

On September 6, 2002, Dr. Putnam reported that Lacroix had a moderate degree of hearing difficulty, but observed that Lacroix could hear him when he used a "slightly above normal tone of voice." Admin. R. at 136. Tests performed by Doctors Tomak and Jones indicated that Lacroix had moderate to severe hearing loss and poor hearing discrimination, and both doctors recommended that Lacroix wear hearing aids. At the administrative hearing, Lacroix testified that she had started wearing a hearing aid in her right ear. She reported that the hearing aid helps her hear, though there are certain environments in which she still has trouble hearing. She testified that, with the hearing aid, she could hear her attorney who was sitting about two feet from her. She also noted that she is good at reading lips. The ALJ was in a position to evaluate Lacroix's hearing limitations first hand, and there is no indication that Lacroix had difficulty hearing or understanding during the administrative proceeding. In determining Lacroix's RFC, the ALJ appropriately took Lacroix's hearing limitations into account, even giving examples of the types of jobs Lacroix could not perform, such as telephone operator and waitress. The RFC as it pertains to Lacroix's hearing loss was supported by substantial evidence.

## C.

Finally, Lacroix argues, somewhat redundantly, that the Commissioner failed to meet her burden of producing evidence that there were jobs available in the national economy for persons with Lacroix's impairments. See Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000) ("If the Commissioner determines that, in light of a claimant's RFC, . . . she cannot perform past work, . . . the burden of production shifts to the Commissioner to produce evidence of jobs available in the national economy that can be performed by a person with the claimant's RFC and vocational skills."). Specifically, Lacroix argues that when the VE testified that such jobs were available, the VE was answering a hypothetical question that did not take into account all of Lacroix's impairments. "Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence

-13-

to support the ALJ's decision." <u>Hinchey v. Shalala</u>, 29 F.3d 428, 432 (8th Cir. 1994). According to Lacroix, the hypothetical should have included the additional mentally based and hearing-loss limitations discussed above. We disagree.

"The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." <u>Id.</u> Moreover, the hypothetical question need not frame the claimant's impairments in the specific diagnostic terms used in medical reports, but instead should capture the "concrete consequences" of those impairments. <u>Roe v. Chater</u>, 92 F.3d 672, 676–77 (8th Cir. 1996). The ALJ's hypothetical question included all of Lacroix's limitations found to exist by the ALJ and set forth in the ALJ's description of Lacroix's RFC. As noted above, the ALJ's findings of Lacroix's RFC are supported by substantial evidence. The hypothetical question was therefore proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits.

## IV.

Our review of the record convinces us that the ALJ's determination is both consistent with the legal standards applicable to Lacroix's case and supported by substantial evidence. Accordingly, we affirm.

_____