# United States Court of Appeals

## For the Eighth Circuit

_____

No. 15-3001

_____

Timothy Brown

*Plaintiff - Appellant*

v.

Carolyn W. Colvin, Acting Commissioner of Social Security

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Jonesboro

_____

Submitted: March 17, 2016
Filed: June 17, 2016

_____

Before WOLLMAN, ARNOLD, and SHEPHERD, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Timothy Brown appeals the denial of his application for disability insurance benefits under Title II of the Social Security Act. See 42 U.S.C. § 401 *et seq.* Brown filed his application for benefits in December 2011, alleging disability beginning in November 2011 due to severe hearing loss, diabetes, diabetic neuropathy, chronic obstructive pulmonary disease, degenerative disc disease of the lumbar spine, and

severe diarrhea caused by medication side effects. Following an August 2013 hearing, an administrative law judge (ALJ) denied Brown's application, the Appeals Council declined to review the ALJ's decision, and the district court affirmed the denial of benefits. On appeal, Brown argues that the ALJ failed to properly assess his hearing loss. We reverse and remand.

At the administrative hearing, Brown testified that he was born in 1958, was fifty-five years old, had a high-school education, and had past relevant work as a sales representative. He stated that he had tried three sets of hearing aids over the years, spending $4,500 on the last set, but that the hearing aids had not done "one bit of good." Brown indicated that he had lost two jobs as a result of his hearing problems. He stated that he had difficulty hearing the television and tried to read lips; that he had to sit "right close" to his wife to converse; and that when his wife spoke to him from another room, "[i]t's like I don't even know she spoke." Brown testified that he talked on the telephone infrequently and avoided crowds because he could not hear or understand conversations in those circumstances. The transcript of the hearing reveals that, shortly after the ALJ began his opening remarks, Brown indicated that he was having difficulty hearing and requested that he be allowed to sit nearer to the ALJ. Brown testified that when he was sitting farther away, he "could hear some kind of voice speaking[, b]ut couldn't understand not one word [the ALJ] said." Brown testified that even after moving to within seven feet of the ALJ, he had to strain to hear the ALJ's questions, as confirmed by the eleven or so occasions on which Brown had to ask the ALJ to repeat himself or clarify a question during the roughly one-hour hearing.

As relevant here, the medical evidence included the results of a consultative audiometric test conducted on January 20, 2012, which revealed that Brown had "severe, sloping to profound sensorineural hearing loss" in both ears and "Speech Reception Threshold (SRT) scores . . . at 95 dB HL" for both ears. The audiologist who administered the test indicated in her report that "reliability for this audiogram

was considered to be questionable," but she provided no further details.[1]  Three days later, Brown underwent a consultative physical examination by Sudhir Kumar, M.D., who diagnosed Brown with bilateral hearing loss and noted that it was "difficult" for Brown to hear normal conversation, that Brown's ability to hear was "poor," and that Brown's auditory loss was fifty percent in each ear.  On February 10, 2012, John Jiu, M.D., conducted a consultative otolaryngological examination, during which he also reviewed the results of the January 20 audiometric test results.  Dr. Jiu's examination notes indicated that Brown's communicative ability was "hearing impaired" and that Brown suffered from "decreased hearing bilateral."  After reviewing the January 20 hearing test, Dr. Jiu confirmed that Brown's "HEARING LOSS/SENSORINEURAL" was "unchanged."[2]  A state agency doctor reviewed this medical evidence and stated that the "audiogram from 1/20/12 showed the claimant meets [listing] level but the results were questionable."  On April 5, 2012, Brown underwent an additional consultative examination by Mark Clemons, M.D., which included an audiogram test that revealed "severe sensorineural hearing loss in both ears with poor discrimination at 46% [in the right ear] and 52%" in the left ear.  Dr. Clemons completed a form to record the results of the test.  The form included a section for the test administrator to rate the reliability of the test conditions, offering three options: "GOOD," "FAIR," or "POOR."  Dr. Clemons circled the space between "FAIR" and "POOR," but he provided no further explanation.

Employing the five-step process set forth in 20 C.F.R. § 404.1520(a), the ALJ found that Brown had not been gainfully employed since the alleged disability onset

[1]In one of several misstatements of the evidence in the denial order, the ALJ identified David Lewis, M.D., as the individual who performed this hearing test and prepared the resulting report when, in fact, it was Misty N. Johnson, M.S., CCC-A, who had done so.

[2]The ALJ also incorrectly stated that Dr. Lewis performed audiometric testing of Brown on February 10, 2012, when, in fact, Dr. Jiu merely reviewed the results of the hearing test conducted on January 20, 2012.

date; that Brown's hearing loss, diabetes, and asthma were severe impairments; but that there was "no evidence" to show that Brown had an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. The ALJ then determined that Brown had the residual functional capacity (RFC) to perform medium work with some exertional and nonexertional limitations, including only "face-to-face . . . verbal communication." The ALJ concluded that none of the limitations in Brown's RFC precluded him from performing his past relevant work as a sales person or sales representative. In the alternative, "considering [Brown's] age, education, work experience, and [RFC]," the ALJ relied on a vocational expert's testimony to conclude that Brown could perform other available work as a cooks helper, retail bagger, grocery-store clerk, or cashier. The ALJ thus concluded that Brown was not disabled.

The Appeals Council's denial of Brown's request for review made the ALJ's decision the final decision of the Commissioner. See Lott v. Colvin, 772 F.3d 546, 548 (8th Cir. 2014). We review the ALJ's denial of disability insurance benefits *de novo* to ensure that there was no legal error and that the findings of fact are supported by substantial evidence on the record as a whole. See Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support a conclusion. See id. We must consider the record as a whole, including evidence that detracts from the ALJ's decision, as well as evidence that supports it. See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011). "[T]he ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004); see also Scott *ex rel.* Scott v. Astrue, 529 F.3d 818, 824 (8th Cir. 2008) (noting that ALJ's obligation to develop the record includes duty to order additional testing if existing test results are invalid); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) (noting ALJ's duty to seek clarifying statements from a treating physician when "a crucial issue is undeveloped"); Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994) (noting that ALJ

has a duty to obtain additional medical evidence if existing evidence is insufficient to determine whether a claimant is disabled, but that such evidence is not required if the record otherwise provides a sufficient basis for the decision).

Brown argues that substantial evidence on the record as a whole does not support the ALJ's assessment of his hearing loss because the ALJ failed to consider whether Brown met the requirements under Listing 2.10 and failed to address or reconcile Brown's inconsistent hearing-test results. We agree. "[T]he listings were designed to operate as a presumption of disability that makes further inquiry unnecessary." Lott, 772 F.3d at 549 (quoting Sullivan v. Zebley, 493 U.S. 521, 532 (1990)). Thus, if the ALJ determines at step three of the sequential analysis that a claimant has a listed impairment, the claimant "must be held disabled, and the case is over." Jones v. Barnhart, 335 F.3d 697, 699 (8th Cir. 2003).

The applicable listing in this case is Listing 2.10, "Hearing loss not treated with cochlear implantation," which provides in relevant part that a claimant has an impairment severe enough to preclude gainful activity if he has "[a]n average air conduction hearing threshold of 90 decibels or greater in the better ear and an average bone conduction hearing threshold of 60 decibels or greater in the better ear," or if he has "[a] word recognition score of 40 percent or less in the better ear." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2.10. In determining whether Brown's severe hearing impairment met or medically equaled a listed impairment, however, the ALJ noted that it had considered Listing 2.08, an earlier provision titled "Hearing Impairments," that was removed from the Listings effective August 2, 2010, and replaced with Listing 2.10. See Revised Medical Criteria for Evaluating Hearing Loss, 75 Fed. Reg. 30,693 (June 2, 2010) (final rules), 73 Fed. Reg. 47,103, 47,106 (Aug. 13, 2008) (proposed rules) (proposing new Listing 2.10 that would apply to individuals without cochlear implants and "remove the requirement for testing with hearing aids"). The ALJ did not mention Listing 2.10, much less make a determination on the record whether the results of Brown's hearing tests met the criteria for Listing 2.10.

The ALJ's failure to identify and analyze the appropriate listing, although error, may not by itself require reversal so long as the record otherwise supports the ALJ's overall conclusion. See Scott, 529 F.3d at 822. This is not such a case. Here, the record as a whole does not support the ALJ's decision because, among other shortcomings, the decision did not adequately account for the inconsistencies in the medical evidence. See, e.g., id. at 823 (noting that, when ALJ fails to support a finding that the claimant did not meet or equal a listing and when the record contains inconsistencies on the issue, "we are unable to determine whether substantial evidence supports the ALJ's finding that [the claimant's] impairments did not meet or medically equal [the] listing"). Brown's January 2012 hearing test reflected a score of 95 decibels in both ears—a score that appears to meet the requirements of Listing 2.10—although the reliability of that test was labeled "questionable." Brown's April 2012 hearing test, on the other hand, reflected "poor discrimination at 46% and 52%"—a score that does not appear to meet the requirements of Listing 2.10. As with the first hearing test, however, the reliability of Brown's April 2012 hearing test was only fair to poor.

In his discussion of the hearing-test results, the ALJ erroneously stated that Dr. Lewis conducted audiometric testing of Brown in February 2012 and, compounding the error, assigned "significant weight to the opinion of Dr. Lewis" because it was based on a thorough evaluation of Brown and was consistent with the other medical evidence. No audiometric testing was done in February 2012. As set forth above, in February 2012, Dr. Jiu—not Dr. Lewis—reviewed the results from the January 2012 hearing test and declared those results, which appeared to meet Listing 2.10, unchanged. The ALJ also assigned "significant weight" to the April 2012 test conducted by Dr. Clemons and the opinion of Stephen Whaley, M.D., a "state agency non-examining expert," whose report cited only the results from the April 2012 hearing test and did not discuss the January 2012 hearing test.

The ALJ did not mention, much less resolve, the seemingly inconsistent results obtained from Brown's two hearing tests. Nor did the ALJ adequately explain why he apparently elected to place greater weight on the results from the April 2012 hearing test rather than the results from the February 2012 hearing test. Neither test was deemed to be altogether reliable—the April 2012 test was deemed of fair to poor reliability, and the February 2012 test was deemed of questionable reliability. In light of these inconsistent and, seemingly equally unreliable test results on a "crucial issue," Stormo, 377 F.3d at 806, as well as the ALJ's failure to accurately describe the medical evidence in the record and his failure to identify or analyze the relevant Listing, we are unable to determine whether substantial evidence on the record as a whole supports the ALJ's finding that Brown did not meet or medically equal a listed impairment, see Scott, 529 F.3d at 822 (concluding that "remand is appropriate where the ALJ's factual findings, considered in light of the record as a whole, are insufficient to permit this Court to conclude that substantial evidence supports the Commissioner's decision").[3] Accordingly, we reverse and remand to the district court with instructions to return the case to the Commissioner for further proceedings consistent with this opinion, which may well require a reevaluation of Brown's RFC, depending upon the severity of his hearing loss.

_____

_____

[3] We have noted that "it may be reversible error for an ALJ not to order a consultative examination when, without such an examination he cannot make an informed choice." Lott v. Colvin, 772 F.3d 546, 549 (8th Cir. 2014) (quoting Conley v. Bowen, 781 F.2d 143, 146 (8th Cir. 1986) (per curiam)). On remand, the ALJ should consider whether an additional consultative hearing test is necessary to determine if Brown's severe hearing impairment meets Listing 2.10. We note that in response to government counsel's rhetorical question, "How many tests do we have to order?" Brown's counsel responded on rebuttal, "Until you get one that is reliable."